UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-23311-CIV-GAYLES/OTAZO-REYES

TED ANTHONY MARTIN JULIEN,

  Plaintiff,

v.

ANDREW M. SAUL,
Commissioner of Social Security,

  Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Plaintiff Ted Anthony Martin Julien's ("Claimant") Motion for Summary Judgment and Memorandum in Support Thereof (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 20] and Defendant Andrew M. Saul, Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 21]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 14].[1] For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

## PROCEDURAL HISTORY

Claimant filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on September 22, 2016, alleging a disability onset date of April 18,

---

[1] The references hereafter (TR. ___) are to the transcript pages rather than the court record pages.

2016. TR. 294-321. The applications were denied initially and upon reconsideration. Id. at 161-238.    Upon Claimant's written request, a hearing was held on July 27, 2017 before Administrative Law Judge Clara Aranda ("ALJ Aranda"), at which Claimant and Vocational Expert Robert Lessne ("VE Lessne") testified. Id. at 103-160.    On January 30, 2018, ALJ Aranda issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through June 30, 2017. Id. at 53.

(2) Claimant had not engaged in substantial gainful activity since April 18, 2016, the alleged disability onset date (20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.). Id. at 54.

(3) Claimant had the following severe impairments: schizoaffective disorder; mild multilevel spondylosis, degenerative disc disease of the cervical spine; and incisional hernia (20 C.F.R. §§ 404.1520(c) and 416.920(c)). Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Id. at 55-56.[2]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform light work with certain exertional and nonexertional limitations. Id. at 58.[3]

(6) Claimant was unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965). Id. at 63.[4]

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a) and 416.925(a).

[3] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments. 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1). The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe." See 20 C.F.R. §§ 404.1520, 404.1545, 416.920 and 416.945.

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

(7) Claimant was born on March 14, 1972 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963). Id. at 64.

(8) Claimant had at least a high school education and was able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964). Id.

(9) Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled," whether or not Claimant had transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2). Id.[5]

(10) Considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)). Id.

(11) Claimant had not been under a disability, as defined in the Social Security Act, from April 18, 2016, through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)). Id. at 65.

On June 28, 2018, the Appeals Council denied a request for review of ALJ Aranda's Unfavorable Decision. Id. at 1-7. On August 14, 2018, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Aranda's final administrative decision [D.E. 1].

In support of his contention that ALJ Aranda's Unfavorable Decision should be reversed, Claimant argues that:

I.      ALJ Aranda failed to properly consider and appropriately analyze all relevant evidence;

II.     New evidence submitted to the Appeals Council was not properly considered despite contradicting ALJ Aranda's decision;

III.    ALJ Aranda failed to properly assess the evidentiary weight given to (treating physician) Dr. Poitier and (consultative psychologist) Dr. Weinstein;

---

[5] SSRs are a series of precedential decisions relating to the programs administered by the SSA and are published under the authority of the Commissioner of Social Security. See http://ssa.gov/regulations/def-ssr.htm.

IV.    ALJ Aranda failed to give proper consideration to the lay testimony of Jessica Mallard ("Ms. Mallard") (Claimant's common law wife);

V.    ALJ Aranda discounted the medical source opinions of treating psychiatrist, Dr. Poitier, without providing sufficient justification;

VI.    ALJ Aranda posed an incomplete and erroneous hypothetical question;

VII.    Contrary to SSR 16-3P, ALJ Aranda improperly suggested a lack of treatment disqualifies Claimant from disability;[6]

VIII.    ALJ Aranda's RFC assessment is not supported by substantial evidence or by either a treating or examining medical source; and

IX.    ALJ Aranda failed to properly consider medication side effects as required by SSR 96-7p and SSR 96-8p.

See Claimant's Motion for Summary Judgment [D.E. 20]. The undersigned finds no merit in any of these contentions.

## RELEVANT MEDICAL EVIDENCE

### I.    Treating Sources

### A. Jackson Memorial Hospital ("Jackson")

Claimant was admitted to the Emergency Room at Jackson on April 18, 2016 after he walked in complaining that he had suicidal ideation and that he had jumped in front of a car, resulting in a fractured patella; he also complained of continued drug use. TR. 465. He reported that he had first attempted suicide by taking pills and by attempting to drown himself. Id. at 474. Associated symptoms at admission included dizziness, right shoulder pain and left knee pain. Id. at 465. His depression was noted as being in the context of drug use, specifically cannabis and cocaine, and psychosocial stressors. Id. at 474. Claimant was noted as unreliable and manipulative, but with a need for inpatient hospitalization due to the suicide attempts; as

---

[6] SSR 16-3p "provides guidance about how [the Commissioner] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." SSR 16-3P, 2016 WL 1119029 (S.S.A. Mar. 16, 2016).

having auditory hallucinations; and as presenting with symptoms of anxiety, depression and abnormal behavior.  Id.  He was diagnosed with: cocaine abuse; cannabis abuse; cannabis abuse with cannabis-induced disorder; cluster B personality disorder; and major depression, recurrent, chronic.  Id. at 478.   Upon discharge, he was: prescribed an angiotensin-converting-enzyme ("ACE") inhibitor, an antidepressant and an antipsychotic; given education on depression and patella fracture; and cleared for psychiatric crisis evaluation and follow-up at the orthopedic clinic. Id. at 471, 495.

Claimant was involuntarily admitted to Jackson via the Baker Act from April 18, 2016 through May 4, 2016.  Id. at 599-952.  At admission, he was alert and oriented x4.  Id. at 648. Upon mental status examination on April 21, 2016, Claimant: was alert and oriented x3; was tearful and cooperative with the interviewer; was open and engaged; avoided eye contact; had clear and coherent speech at a regular volume, rate and tone; had a mood-congruent and constricted affect; had an organized thought process; reported symptoms of depression; reported auditory hallucinations with negative connotations; had limited insight and judgment; had intact attention but impaired concentration; had grossly intact memory and fund of knowledge; and had no abnormal movements or psychomotor retardation.  Id. at 661-62.  He was assigned a Global Assessment of Functioning ("GAF") score of 30.  Id. at 629.[7]  By April 24, 2016, Claimant reported that his auditory hallucinations were "better."  Id. at 668.   On April 25, 2016, he reported difficulty sleeping and feeling down, but that his mood had improved overall, and he was looking forward to the next chapter of his life and starting a substance abuse rehabilitation program.  Id. at 671.  Claimant's leg pain was well controlled with pain medication.  Id. at 675,

---

[7] The GAF scale is a numeric scale that mental health clinicians use to rate the occupational, psychological, and social functioning of individuals.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders IV-TR 32-34 (4th ed. 2000).
   A GAF score of 21-30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  Id. at 34.

680.   By May 3, 2016, Claimant was: alert and oriented x3; fairly groomed and sitting comfortably with an immobilizing brace in place on his leg; calm, cooperative and pleasant; clear and coherent in speech; "down" and dysthymic; mood-congruent and brighter than previously; organized and goal-directed in his thought process; and with fair insight, judgment, attention and concentration; and he denied delusions, hallucinations and suicidal ideations. Id. at 702. He was cleared for discharge on May 4, 2016, at which time he was alert and oriented x3, denied suicidal ideation and hallucinations, and was provided with a 30-day supply of medication. Id. at 765.

On May 31, 2016, Claimant was admitted to Jackson again, this time reporting severe depression, suicidal thoughts, anger, and feelings of wanting to hurt others. Id. at 1001. On June 2, 2016, he was reporting homicidal ideations towards his wife and vague auditory hallucinations; and he denied somatic complaints. Id. at 1294. He was assessed as high risk for suicide and homicide. Id. at 1295. He was provided with group and supportive therapy; and he was initially placed on an antipsychotic, a nerve pain medication/antidepressant, an anticonvulsant, and an ACE inhibitor. Id. at 1296. On June 7, 2016, Claimant: denied suicidal/homicidal ideations; denied delusions but reported hallucinations; was alert and oriented x4; was calm and cooperative; had a "better" mood and brighter affect; was open and engaged; had intellectual insight; had good hygiene/grooming; and had an organized and goal-directed thought process. Id. at 1309. At discharge on June 8, 2016, Claimant's diagnoses included: epilepsy; hypertension; depression, major, recurrent, severe with psychosis; cannabis abuse; and cocaine dependence. Id. at 1017. He denied suicidal/homicidal ideations and auditory/visual hallucinations. Id. at 1058. His discharge medication included an antipsychotic and nerve pain medication/antidepressant, to which he had responded well and as a result of which he had

exhibited improved symptoms with no side effects.  Id. at 1361.  He was discharged to self, accepted to a rehabilitation program, and referred to New Horizons for further mental health services.  Id. at 1058.

Claimant was admitted to Jackson again from September 2, 2016 through September 19, 2016 via Baker Act after attempting suicide by taking 25 Tylenol pills and swallowing cocaine. Id. at 1879-80.  He reported that he had been hearing voices, that he had been carrying a gun, and that he intended to kill his ex-wife.  Id. at 1459, 1707.  He reported that his depressive symptoms were getting worse, including anxiety, dysphoria, suicidal thoughts, anger, and the presence of voices.  Id. at 1715.  He had a disorganized thought process, poor insight and judgment, and poor attention and concentration.  Id. at 1716.  Claimant was willing to continue receiving voluntary treatment and requested an adjustment in medications; and he denied side effects.  Id. at 1708, 1715.  Claimant's medications were adjusted, and he was started on an anti-tremor medication and a new antipsychotic.  Id. at 1462-63.  Claimant's diagnoses at discharge included: cannabis/marijuana dependence, continuous use; cocaine abuse, episodic; high blood pressure; borderline personality disorder; major depressive disorder, recurrent, severe, with psychosis; seizure disorder; and schizoaffective disorder, unspecified.  Id. at 1431, 1861.  Upon discharge, he was alert and oriented x4 and in stable condition.  Id. at 1896.  Although Claimant desired placement, he was afraid to be placed in a shelter; and he was ultimately discharged to self as there were no shelter beds available.  Id. at 1431, 1750, 1968.

On October 28, 2016, psychiatry notes indicate that Claimant presented for a medication refill and that he was adequately controlled on his current regimen; and that, although Claimant desired alteration in medication, dosages would not be altered until he had a long-term plan in place at New Horizons, which he was scheduled to attend.  Id. at 1929-30.  Claimant stated that

his mood was better and that the medication had been controlling his hallucinations; and his only side effects were drowsiness, difficulty focusing, and feeling "wired." Id. at 1929. However, he still felt unable to return to work and had resigned three days after attempting to do so. Id. He was in stable condition, alert and oriented x3, and presented generally normal on physical and mental status examination. Id. at 1930.

On February 3, 2017, Claimant presented for a follow-up evaluation of his hypertension. Id. at 2005. It was noted that he was not taking any medication at the time, but that he recalled taking four psychiatric medications, one of which was discontinued due to low blood pressure. Id. He was alert and oriented x4, and he appeared cooperative and appropriate in mood and affect. Id. at 2007.

On March 26, 2017, Claimant presented complaining of five days of abdominal pain, accompanied by nausea and diarrhea, at the area of a peri-incisional hernia he had due to a gunshot wound twenty years earlier. Id. at 2057. He was alert and oriented x4, in no acute distress, and cooperative. Id. at 2058. He was diagnosed with ventral hernia and discharged to home in stable condition with instruction to follow up in one to two weeks' time. Id. at 2060.

On May 24, 2017, Claimant complained of headaches, neck pain and lower back pain following a motor vehicle accident. Id. at 2062. The pain had increased from minimal to moderate. Id. at 2064. Claimant was alert and oriented x4 and cooperative. Id. at 2066. Physical examination showed the neck was supple, trachea midline, and mild tenderness to palpation of the cervical spine posterior over C3-C6. Id. at 2066. A lumbosacral spine procedure revealed a mild multilevel spondylosis with no evidence of acute fracture or traumatic spondylolisthesis. Id. at 2067. Computed tomography ("CT") scans of the brain and cervical spine revealed no evidence of hemorrhage, midline shift, mass effect, acute fracture, or

malalignment in the cervical spine. Id. at 2068. Claimant complained of left-sided weakness that had improved over the course of the hospitalization for the motor vehicle accident. Id. at 2088. Imaging revealed multilevel cervical spondylosis with moderate canal stenosis C3-C4-C6-C7 along with severe bilateral foraminal stenosis at C6-C7; and flexion extension film of the cervical spine did not demonstrate any obvious instability, fracture or subluxation. Id. at 2089. An assessment indicated that there was some left-sided weakness, which was not explained by the cervical MRI findings; and a neurology workup was recommended. Id. Claimant was diagnosed with acute neck pain and discharged to home with a cervical collar in improved, stable and ambulating condition. Id. at 2068-69. He was prescribed a narcotic pain reliever, and he returned four days later requesting a refill. Id. at 2169.

On June 2, 2017, Claimant returned to Jackson for a follow-up visit, complaining of neck pain, loss of balance and problems walking. Id. at 2051. On June 12, 2017, Claimant returned to Jackson stating that, ever since the motor vehicle accident, he had become weak, his entire body was numb from the neck down, he was dizzy, and he had had a syncopal episode that day. Id. at 2120. He was continent and able to ambulate. Id. He reported that he had constant neck pain like a spasm/cramping that caused him to slowly turn his head to the left, that the pain travelled down his spine, and that he noticed left sided weakness and decreased sensation in his face, arm and leg. Id. at 2090. He also complained of a constant headache that peaked at a pain level of 10/10 and for which he took a narcotic pain reliever daily. Id. Upon physical examination, he had sternocleidomastoid tenderness, limited range of movement due to pain in all directions and mild cervical spine tenderness. Id. at 2091. A CT scan of Claimant's spine revealed degenerative changes throughout the cervical spine without evidence of acute fracture or dislocation; and showed that straightening of the cervical spine might be due to posttraumatic

muscle spasm or patient positioning.  Id. at 2142.  On June 16, 2017, Claimant's diagnoses included cervicalgia, cervical spinal stenosis, and cervical spondylosis without myelopathy or radiculopathy.  Id. at 2104.  On June 25, 2017, Claimant returned complaining of pain and stating that he needed medication because he had been without it for two days.  Id. at 2082.  His prescriptions for a muscle relaxant, ACE inhibitor and narcotic pain reliever were refilled; he was diagnosed with musculoskeletal pain and hypertension; and he was discharged in improved and stable condition.  Id. at 2086-87.

**B.  Jay M. Weinstein, Ph.D. ("Dr. Weinstein")**

Dr. Weinstein conducted a General Clinical Evaluation of Claimant on December 1, 2016.  Id. at 1901-03.  Claimant arrived at the appointment unaccompanied via transportation from his shelter.  Id. at 1901.  His chief complaint was emotional problems, and he also reported poor sleep and appetite.  Id.  He stated that he used to work for a restaurant, however did not feel safe around knives.  Id.  Dr. Weinstein opined that Claimant: was cooperative with good eye contact; had acceptable grooming and personal hygiene; was a functional communicator with clear and organized, but limited speech; had logical and congruent responses; had blunted affect with a depressed mood; had poor judgment and limited insight into the nature of his problems; and tolerated testing well and completed all tasks presented to him.  Id. at 1902.  Dr. Weinstein opined that there was no evidence of an aphasia, agnosia, apraxia, alexia or agraphia; and that there was no overt evidence of a psychosis, but a thought disorder might be present.  Id.  Claimant admitted to suicidal and homicidal ideation and stated that he heard voices.  Id.  On mental status examination, Dr. Weinstein observed that Claimant had a full sensorium, poor attention and concentration, poor short-term memory, poor fund of information, poor calculation skills and poor reasoning.  Id.  Dr. Weinstein further observed that Claimant was unable to

manage his finances; was able to dress, bathe and feed himself; and was able to stay on task without difficulty. Id. at 1902-03. He noted that Claimant stopped working due to his paranoia. Id. at 1903.

Dr. Weinstein noted that records were not available at the time of the report to substantiate Claimant's statements concerning his emotional complaints. Id. at 1903. He opined that Claimant was not motived to seek employment. Id. Dr. Weinstein stated that Claimant "did not put forth an adequate effort on today's examination to allow for a valid assessment of his current functioning." Id. Dr. Weinstein's diagnostic impressions included schizoaffective disorder by history, hypertension, seizures, asthma, sleep apnea, occupational problems, problems with the social environment, and access to adequate housing. Id.

### C. New Horizons Community Mental Health Center, Inc. ("New Horizons")

A letter dated February 10, 2017, indicated that Claimant began treatment at New Horizons on September 30, 2016 under the supervision of Nelson Andino, ARNP ("ARNP Andino") and Joseph Poitier, M.D. ("Dr. Poitier"). Id. at 1982. Claimant's diagnosis was schizoaffective disorder; and his medications at the time included an antipsychotic, an anti-tremor medication, and a nerve pain medication/antidepressant. Id.

A letter dated July 25, 2017, signed by Dr. Poitier, indicated that Claimant began treatment at New Horizons on July 1, 2013 and had continued receiving treatment there through the date of the letter. Id. at 2190. Dr. Poitier stated in the letter that ARNP Andino was Claimant's treating psychiatric professional. Id. Dr. Poitier further stated that: Claimant's psychiatric conditions and circumstances were progressively poor, resulting in interruptions with his daily coping mechanism; Claimant's mental illness was permanent; and Claimant was mentally unstable to work. Id.

New Horizons treatment records ranged from December 6, 2016 through July 17, 2017. Id. at 2171-78.  On December 6, 2016, a psychiatric evaluation indicated that Claimant was referred from the Miami Rescue Mission/Jackson Crisis.  Id. at 2178.  Claimant's chief complaints included hearing voices, depression and inability to sleep.  Id.  Upon mental status examination, he was described as follows: appropriate in appearance; cooperative but suspicious; unremarkable speech; normal motor behavior; appropriate affect; depressed and anxious mood; circumstantial thought process with flights of ideas; no suicidal or homicidal ideations; auditory hallucinations; paranoid delusions; alert sensorium; oriented x3; unremarkable memory; poor insight and judgment; and decreased sleep.  Id. at 2180-81.  His diagnosis was indicated as schizoaffective disorder depressive type. Id. at 2181.

On January 10, 2017, ARNP Andino opined that Claimant: was depressed; had circumstantial thought; was experiencing auditory hallucinations and paranoid delusions; was alert and oriented to time only; had poor insight, judgment and reliability; had a decrease in sleep; and was not exhibiting suicidal or homicidal ideations.  Id. at 2177.  No medication side effects were observed, and Claimant reported no pain.  Id.   ARNP Andino assigned Claimant a GAF score of 54.[8]  Id.  On February 7, 2017, Claimant remained the same except he: exhibited flight of ideas; was no longer experiencing delusions; was alert and oriented x3; and had poor insight, but fair judgment and reliability.  Id. at 2176.  There were no side effects from medication observed and Claimant reported no pain.  Id.  He was assigned a GAF score of 56. Id.  On March 7, 2017, Claimant: appeared impulsive; had slow speech; had retarded behavior; had a labile affect; had an anxious mood; was again experiencing auditory hallucinations and

---

[8] A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders IV-TR 34 (4th ed. 2000); See Wind v. Barnhart, 133 F. App'x 684, 687 n.1 (11th Cir. 2005).

paranoid delusions; was alert and oriented x3; and had poor insight and fair judgment and reliability. Id. at 2175. He exhibited no side effects from medications and reported no pain. Id. He was assigned a GAF score of 58. Id. On April 4, 2017, Claimant: was cooperative; had retarded motor behavior; had a labile affect; had circumstantial thought process and unremarkable thought content; was experiencing auditory hallucinations and paranoid delusions; was alert and oriented x3; and had fair insight, judgment and reliability. Id. at 2174. There were no medication side effects observed and Claimant did not report any pain. Id. He was assigned a GAF score of 60. Id. On May 2, 2017, Claimant had: a fearful attitude; normal motor behavior; a labile affect; a depressed mood; a thought process characterized by a flight of ideas; an impaired memory; and poor insight but fair judgment and reliability. Id. at 2173. He was still experiencing auditory hallucinations and paranoid delusions; and was alert and oriented x3. Id. There were no observed side effects and no pain reported. Id. He was assigned a GAF score of 58. Id. On June 6, 2017, Claimant: appeared disheveled; had a blunt affect; was not experiencing hallucinations or delusions; was alert and oriented x3; and had fair insight and good judgment and reliability. Id. at 2172. There were no observed side effects and Claimant reported no pain. Id. at 2172. He was assigned a GAF score of 60. Id. On July 17, 2017, Claimant had: appropriate appearance; a cooperative attitude; unremarkable speech; normal motor behavior; appropriate affect; a depressed mood; a circumstantial thought process; no hallucinations or delusions; and fair insight, judgment and reliability. Id. at 2171. He was alert and oriented to time and place, but not person. Id. No medication side effects were observed, but Claimant did report that he was experiencing neck pain. Id. He was assigned a GAF score of 60. Id.

## II.   State Agency Determiners

### A.   Thomas Conger, Ph. D. ("Dr. Conger")

On June 3, 2016, at the initial level, Dr. Conger found that there was insufficient evidence to make a determination due to the lack of comprehensive activities of daily living and professional input to clarify the diagnosis and level of deficits.  Id. at 166, 174.

### B.   Jane Cormier, Ph.D. ("Dr. Cormier")

On December 15, 2016, at the reconsideration level, Dr. Cormier opined that Claimant had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two repeated episodes of decompensation, each of extended duration.  Id. at 188-89, 205-06.  She further opined that Claimant: appeared capable of understanding/recalling simple and detailed tasks; had some difficulty with attention and concentration for extended periods of time but appeared capable of performing both simple and detailed tasks on a reasonably sustained basis; had some difficulty working closely with the public at the time but had a long history of work as a chef; had judgment that may have been impacted by substance abuse; appeared capable of appropriate interaction with coworkers; appeared capable of adapting to changes in routine, recognizing/responding to most hazards and making plans independently; and appeared capable of performing routine tasks on a sustained and independent basis and in a socially appropriate manner as so motivated.   Id. at 195, 212.  She opined that his prognosis was improved with substance-abstinence and treatment compliance.  Id. at 195.  Upon reviewing the evidence of record, she opined that Claimant's statements and allegations were partially consistent with the objective data and that there was evidence of mood disorder with symptoms of psychosis at times, although such were most likely related to substance abuse.  Id. at 189, 206.

### C.  Minal Krishnamurthy, M.D. ("Dr. Krishnamurthy")

On December 19, 2016, at the reconsideration level, Dr. Krishnamurthy opined that Claimant had exertional limitations in that he could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand, walk and/or sit for a total of 6 hours in an 8-hour workday; and push and/or pull unlimited for lift and/or carry.  Id. at 191, 208.  Dr. Krishnamurthy further opined that Claimant had postural limitations in that Claimant could: climb ramps/stairs frequently; never climb ladders/ropes/scaffolds; balance and stoop without limitation; and frequently kneel, crouch, and/or crawl.  Id. at 191-92, 208-09.  Dr. Krishnamurthy opined that Claimant did not have manipulative, visual or communicative limitations.  Id. at 192, 209.  Dr. Krishnamurthy opined that Claimant had environmental limitations in that Claimant must avoid concentrated exposure to extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, poor ventilation, etc.; and avoid even moderate exposure to hazards (machinery, heights, etc.).  Id.  Upon review of the evidence of record, Dr. Krishnamurthy opined that Claimant's symptoms were partially consistent and that Claimant should be capable of the activities as described in the RFC.  Id. at 193, 210.

### EVIDENCE SUBMITTED POST-DECISION[9]

### A.  Albert Ray, M.D. ("Dr. Ray")

Dr. Ray's report lists a consultation date of October 3, 2017.  Id. at 72.  Upon physical examination, Dr. Ray noted that Claimant's cervical, thoracic and lumbosacral spine showed tenderness and, upon review of x-rays, also showed osteoarthritis.  Id. at 72-73.  Dr. Ray diagnosed Claimant with: cervicalgia; cervical spine root lesion; rule out herniated disc, cervical spine; thoracic spine sprain/strain; lumbago; sacroiliitis; lumbosacral spine sprain/strain; and

---

[9] This evidence, which was submitted after the Unfavorable Decision, was considered by the Appeals Council.

possible adverse medication reaction with fainting and orthostatic hypertension.  Id. at 73.  He

opined that Claimant had reached maximum medical improvement from conservative treatment

and that Claimant had an 8% partial permanent impairment as a direct result of his May 24, 2017

motor vehicle accident.  Id. at 73.

### B. Erick Salado, M.D. ("Dr. Salado")

Dr. Salado's orthopedic consultation report is dated October 4, 2017.  Id. at 82.  He noted

that Claimant complained of severe difficulties with his neck and upper and lower back.  Id.  He

further noted that, upon physical examination, Claimant experienced pain upon palpation of the

cervical spine, thoracic spine and lumbosacral spine.  Id. at 83.  Dr. Salado diagnosed Claimant

with: cervical sprain; C6-C7 bilateral neural foramina stenosis; C5-C6 right foramina stenosis;

C3-C4 moderate canal stenosis; thoracic sprain; lumbosacral sprain; and lumbosacral radiculitis.

Id. at 84.  Dr. Salado opined that Claimant had reached maximum medical improvement and that

Claimant had been left with an 8% permanent partial impairment as a result of his May 24, 2017

motor vehicle accident.  Id. at 84-85.  He further opined that Claimant should not: lift over 20

pounds; engage in activities or occupations that require repetitive movements of the spine, such

as pushing, pulling, lifting or hauling; or participate in high impact activities.  Id. at 85-86.

### C. New Horizons

Claimant submitted six New Horizons monthly treatment notes dated October 23, 2017

through April 20, 2018.[10]  Id. at 2, 94-102.  These notes showed that Claimant's status remained

generally consistent with prior observations at New Horizons, with auditory hallucinations noted

on four of six of the monthly treatment notes – December 26, 2017, February 21, 2018, March

23, 2018, and April 20, 2018.  Id. at 95, 97-99.  Each of the monthly treatment notes indicated

---

[10] The treatment notes are individually dated: October 23, 2017; December 26, 2017; January 23, 2018;
February 21, 2018; March 23, 2018; and April 20, 2018.

that Claimant was alert and oriented x3; and that he had fair insight, judgment and reliability. Id. at 94-99. During this same time span, there were no signs of suicidal or homicidal ideations noted; and no medication side effects observed. Id. All but one of the notes indicate that Claimant had been assigned a GAF score of 60; the other, a GAF score of 58. Id.

Psychiatric evaluations and functional assessments by Dr. Poitier and ARNP Andino were also submitted, each of which was dated February 28, 2018. Id. at 9-21. In his psychiatric evaluation, Dr. Poitier listed schizoaffective disorder as Claimant's diagnosis and opined that Claimant's psychiatric impairments lasted, or would be expected to last, for a continuous period of not less than 12 months; and that, on average, Claimant would be likely to call in sick and unable to work as a result of his impairments more than four times a month. Id. at 9. Dr. Poitier listed drowsiness as a side effect of medication. Id. at 10. He further opined that substance abuse was not material to Claimant's condition. Id. In his functional assessment, ARNP Andino opined that Claimant had a poor or no ability to: deal with the public; use judgment; maintain attention/concentration; follow work rules; understand, remember and carry out complex job instructions; use intellectual ability; or concentrate. Id. at 11-12. He further opined that Claimant had paranoia, depression, social anxiety, constant hallucinations and psychosis; and that Claimant would likely be off task greater than 15% during an 8-hour workday and would not be able to work at a regular, full-time job on a sustained basis. Id. at 12-13.

### AFFIDAVIT OF MS. MALLARD

Ms. Mallard testified by way of an affidavit dated July 26, 2017. Id. at 444-46. She stated that she had known Claimant for fifteen years, she had lived with him for twelve years, and he was the father of her three children. Id. at 444. She stated that she had observed Claimant begin to have mental health problems in 2008 or 2009, when he became depressed and

violent, reported auditory and visual hallucinations, and made suicidal and homicidal threats towards her. Id. Ms. Mallard claimed that she attempted to find mental health treatment for him but was unable to, and she was unaware that he ever went to any appointments. Id. Things grew worse – Claimant would break things around the house, steal Ms. Mallard's car for days at a time, physically abuse himself, and leave letters around the house wherein he wrote about his hallucinations. Id. at 444-45. Ms. Mallard stated that Claimant was Baker Acted a few times and would disappear. Id. She was informed by doctors from Jackson that Claimant had been put on medications. Id. Things grew more chaotic and Ms. Mallard asked Claimant to leave her home repeatedly; and she had to call the police and get help from her landlord at times when he would not leave. Id. Ms. Mallard stated that Claimant had periods where he seemed okay but then he would just go crazy. Id. He had crying spells. Id. She stated that Claimant received medication and therapy at the hospital. Id. She did not know how he got to the Miami Rescue Mission. Id. She stated that Claimant needed more help. Id.

## DISABILITY REPORTS

### I.   MAY 2016 DISABILITY REPORT

Claimant, through a non-attorney representative, completed a Disability Report dated May 2, 2016. Id. at 362-368. He listed the physical and mental conditions that limited his ability to work as: major depressive disorder, severe psychotic features, and chronic mental illness. Id. at 363. He indicated that these conditions caused him pain or other symptoms; and that he stopped working on March 1, 2016 because of these conditions. Id. He indicated that his work in the prior 15 years was as a chef, a position in which he: walked for 6 hours a day, stood for 2 hours a day, handled large objects for 4 hours a day, handled small objects and/or reached for 2 hours a day, carried up to 50 pounds and frequently lifted 25 pounds. Id. at 365. He indicated that he had seen a doctor or other health care professional or received treatment at a hospital or

18

clinic, or had a future appointment scheduled, for both physical and mental conditions. Id. at 366. He further indicated that he had a history of homicidal ideations; and that he was in constant pain and his personal mobility was limited due to a broken leg bone and knee cap problem. Id. at 368. He indicated that he was wheelchair bound and that he had intermittent seizure activity due to having received a gunshot to the head years prior. Id.

## II.   OCTOBER 2016 DISABILITY REPORT

Claimant, through a non-attorney representative, completed a Disability Report on appeal dated October 12, 2016. Id. at 395-401. He indicated that there was a change in his physical or mental conditions on September 2, 2016; specifically, that his suicidal thoughts, psychosis, depression, homicidal thoughts, and auditory hallucinations had increased in frequency. Id. at 396. He also indicated that he had the new mental condition of schizoaffective disorder. Id. He indicated that he had been, or would be, treated for mental conditions (including emotional or learning problems); and that he had received medication and was hospitalized on the date of the Disability Report due to schizoaffective disorder, suicidal ideations and auditory hallucinations. Id. at 397, 400. He indicated that his condition was continuing to deteriorate and that he had become homeless due to his inability to function in society. Id. at 400.

## HEARING TESTIMONY

A hearing was held on July 27, 2017 before ALJ Aranda, at which Claimant and VE Lessne testified. Id. at 103-160.

## I.   Claimant

Claimant testified that he was born in 1972 and was 44 years old. Id. at 118. He was living in a shelter. Id. at 119. He was single, but he had a fiancée named Jessica Mallard. Id. at 120. He had three children who lived with Ms. Mallard, and their ages were about 13 or 14, 10

or 11, and 6 or 7.  Id. at 121-22.   Claimant did not have a valid driver's license because it was suspended or revoked for failure to pay tickets.  Id. at 123.  An escort from his shelter drove him to the hearing.  Id.  Claimant attended technical college for engineering and vocational college for agricultural engineering; and he had a GED.  Id.  Claimant had worked as a chef, a position he learned on the job and not from any formal training.  Id. at 124.

Since 2000, Claimant had worked as a sous chef at Martini Bar, where he was responsible for ordering stock and organizing supplies.  Id. at 124-25.  He worked there for three to four months, then stopped when he was told that people did not like being around him because he "isolated" too much and talked to himself.  Id. at 125.  Prior to that, he worked as head cook at Flashback Diner, also called Lazaro Incorporated, for two or three years.  Id. at 126.  His responsibilities there included supervising fifteen or more people, running the line efficiently and ensuring food freshness and quality.  Id. at 126-27.  He was let go from that position on three different occasions because the owner wanted him to seek mental health assistance due to his "isolating" and because people were afraid of him.  Id.  The last time, the police removed him from the job.  Id.  He also worked at American Airlines Arena as a cook, where he cooked and prepped food and was responsible for other workers.  Id.  He did not work there very long and was dismissed.  Id. at 128.  He also worked at Double Tree as a maintenance engineer for about seven months, where he was employee of the month every month; and his responsibilities included paving, concrete work, electrical work, air conditioning work, and pool maintenance. Id.  Specifically, he ran wire, changed light fixtures, performed maintenance on air conditioner units, changed air filters, cleared clogged lines, and performed basic electrical work.  Id. at 129. Claimant also worked as a dish washer and a construction laborer.  Id. at 130.  Claimant stated

that he was a skilled laborer in that he used a jackhammer, saw and drills; and did a bit of carpentry. Id. at 130-31.

Claimant began using cannabis in the early 1990s, when he was in his early twenties. Id. at 131. He had not used any drug, except medication, since May or April of the year prior. Id. Before he stopped, he used marijuana a lot (which to him meant one joint three or four times a week) because it was the only time he could be happy and not hear evil voices in his head. Id. at 131-32. Since the 1990s, he did this off and on, using marijuana when he could not afford medication. Id. at 132-33. Claimant attempted suicide by ingesting what he thought was an overdose of cocaine in the mid-90s. Id. at 133. Some years later, he began putting cocaine in his marijuana joints, but he didn't do it regularly. Id. After 2009, he used cocaine as much as he could – on average, four days a week. Id. at 134. He would use a quarter of a gram each time, which he would swallow or sprinkle in his marijuana before smoking. Id. at 134-35. Using cocaine was the only thing that made the voices in his head go numb. Id. at 135. Claimant had never used alcohol or any drugs other than cocaine and marijuana. Id. In April 2016, Claimant injured his knee after an attempted suicide; and at that time, he tested positive for cocaine and marijuana. Id. at 136. Because of that incident, he was referred for mental health treatment. Id. Before that, he had received mental health treatment off and on at New Horizons back in 2013. Id. at 137. He would also seek refills on his prescriptions at the crisis psychiatric ward and saw a psychiatrist at University of Miami, but he had trouble paying the costs. Id. In May of the year prior to the hearing, Claimant had undergone treatment to overcome substance abuse. Id. at 138-39. He had not had any substance abuse relapses since that time. Id. at 139. He attended men's groups through Miami Rescue Mission to help maintain his sobriety. Id. He began receiving formal mental health care after April 2016, first at Jackson and then at New Horizons. Id. at 140.

Claimant received pro bono treatment from a New Horizons doctor, "Dr. Sam," at Miami Rescue Mission. Id. at 140-41. They would have conversations, but Dr. Sam never took notes. Id. at 141. After starting formal treatment at New Horizons in December 2016, Claimant lost the urge to abuse cocaine and marijuana around May of the year prior to the hearing, at which point he was on mental health medications. Id. at 142.

Claimant felt that he had improved in the sense that he no longer needed drugs to drown out the voices, but he still had the thoughts in his head. Id. The thoughts were spirits telling him things about people and they caused him to isolate himself. Id. at 143. At New Horizons, Claimant saw Dr. Portiere and ARNP Andino. Id. He had sat down with Dr. Portiere four or five times since he began treatment in December 2016, and he usually saw ARNP Andino. Id. at 143-44. Claimant went to New Horizons once a month for medications. Id. at 144. At the hearing, Claimant was wearing a neck brace because of a car accident where his vertebrae shifted, resulting in migraines. Id. The neck brace and pain management prevented the migraines. Id. Someone had obtained a lawyer for him because of that incident, but Claimant did not know the status of any case. Id. Since the accident, he had received treatment at Jackson and from a chiropractor. Id. at 145. In addition to neck problems, Claimant also had continuous muscle spasms from his neck down to his lower back on the right side. Id. The pain caused him difficulty sitting up in the morning. Id. In terms of auditory hallucinations, Claimant indicated that those were his friends who talked to him all the time, every day, and they only stopped when he went to bed. Id. at 145-46. He slept about three to four hours per night with medication. Id. at 146. He was able to shower and take care of his personal hygiene. Id. The Miami Rescue Mission provided meals for him. Id. at 147.

On an average day, Claimant would get up, brush his teeth, and then go sit in the church with his Bible and try to talk to God. Id. He would go for lunch and then return to the church. Id. He would have dinner, read his Bible on his bed, and then try to go to sleep. Id. He would go to meetings, sometimes in the morning and other times in the afternoons. Id. He never saw his children. Id. He last saw his children about two years before the hearing. Id. at 148. He did not do his own laundry – the Mission did it. Id. They did not allow him to keep food for himself. Id. He shared a room with about 40 men – one room with many bunk beds. Id. Claimant kept his area clean. Id. at 149.

Claimant had a little difficulty walking due to the accident in May 2017. Id. He stated that the problem with the walking was due to his medication – it made his head cloudy and he would get weakness in the knees, making him a fall risk. Id. He told his doctors about this and he believed that is why they wanted to switch him to a stronger medication. Id. He could stand for a few minutes without a problem and then he would feel exhausted. Id. His chiropractor told him that he was not allowed to lift over ten pounds due to his neck. Id. at 149-50. Due to the accident in May 2017, he had problems sitting up straight – it hurt his lower back if he did not push forward while sitting. Id. at 150. He was right-handed. Id.

Claimant had two cousins who suffered from mental illness and were in mental institutions. Id. His grandmother also suffered mental illness in her late forties. Id. When Claimant worked at Flashback, back in 2011 or 2012, he was the victim of a carjacking, during which he was robbed and stabbed; and his hand was run over by a car, which required surgery and resulted in a rebuilt left elbow. Id. at 151. At the time of the hearing, his left elbow stuck up and was not straight, which limited the use of his left arm in that his left hand had become weaker than his other hand. Id. at 151-52. Claimant testified that the side effects of his

medications included suicidal thoughts and that the thoughts in his head always affected his concentration. Id. at 158.

## II.     VE Lessne

VE Lessne classified Claimant's prior work as:

➢ Kitchen helper, DOT #318.687-010,[11] with an exertional level of medium[12] and an SVP of 2;[13]

➢ Cook, DOT #315.361-010, with an exertional level of medium and an SVP of 6;[14]

➢ Sous chef, DOT #313.131-026, with an exertional level of medium and an SVP or 8;[15]

➢ Construction worker II, DOT #869.687-026, with an exertional level of very heavy[16] and an SVP of 2;

➢ Maintenance preparer, DOT #899.131-010, with an exertional level of medium and an SVP of 7;[17] and

➢ Swimming-pool servicer, DOT #891.684-018, with an exertional level of medium and an SVP of 4.[18]

---

[11] DOT is the acronym for the Dictionary of Occupational Titles ("DOT"), which was created by the Employment and Training Administration and groups jobs based on their similarities and defines the structure and content of all listed occupations. See DOT app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[12] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c) and 416.967(c).

[13] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." See DOT app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
   An SVP of 2 means that preparation for the job should extend "beyond short demonstration up to and including 1 month." Id.

[14] An SVP of 6 means that preparation for the job should extend "[o]ver 1 year up to and including 2 years." Id.

[15] An SVP of 8 means that preparation for the job should extend "[o]ver 4 years up to and including 10 years." Id.

[16] "Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." 20 C.F.R. §§ 404.1567(e) and 416.967(e).

[17] An SVP of 7 means that preparation for the job should extend "[o]ver 2 years up to and including 4 years." See DOT app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[18] An SVP of 4 means that preparation for the job should extend "[o]ver 3 months up to and including 6 months." Id.

Id. at 153-54. ALJ Aranda posed a hypothetical to VE Lessne as follows:

> I would like you to assume a person of the same age, with the same education and work experience as Mr. Julien. The individual is limited to the light exertional level, however, has the following additional limitations. The individual can never climb ladders, ropes or scaffolds. The individual can frequently climb ramps and stairs. The individual can frequently kneel, crouch and crawl. The individual can never work at unprotected heights. The individual must avoid concentrated exposure to extreme heat and extreme cold, humidity, vibrations, hazards, fumes, odors, dust, gases and poor ventilation. The individual must avoid even moderate exposure to hazards, can understand and remember simple instructions, can perform simple routine and repetitive tasks, can make simple work-related decisions, can adequately adapt to simple changes in the work place and the individual is able to interact frequently with supervisors and co-workers, and occasionally with the general public.

Id. at 154-55. VE Lessne testified that such a hypothetical individual could not perform Claimant's past relevant work. Id. at 155. VE Lessne testified that this hypothetical individual could perform the following representative jobs:

➢ Cleaner, DOT #323.687-014, with an exertional level of light and an SVP of 2, with 492,792 jobs in the national economy;

➢ Office helper, DOT #239.567-010, with an exertional level of light and an SVP of 2, with 62,342 jobs in the national economy; and

➢ Auction assistant, DOT #294.687-010, with an exertional level of light and an SVP of 2, with 30,426 jobs in the national economy.

Id. at 155-56. In response to ALJ Aranda's inquiry, VE Lessne testified that the typical employer tolerance in the unskilled labor market for an individual being off task throughout the day would be 5% and almost no tolerance during the probationary period. Id. at 156. In response to Claimant's counsel's inquiry, VE Lessne testified that a hypothetical individual who would miss one day a month would not be tolerated by employers, especially during the probationary period. Id. at 157.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011). Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid." Williams, 416 F. App'x at 862.

## REGULATORY FRAMEWORK: THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled. Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Aranda determined that Claimant was not engaged in SGA since the alleged disability onset date of April 18, 2016 and proceeded to step two. TR. 54.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step. Phillips, 357 F.3d at 1237.  In this case, ALJ Aranda found

that Claimant suffered from the severe impairments of schizoaffective disorder; mild multilevel spondylosis, degenerative disc disease of the cervical spine; and incisional hernia. TR. 54. ALJ Aranda then proceeded to step three. Id.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations. Phillips, 357 F.3d at 1238. If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four. Id. Here, ALJ Aranda determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. TR. 55-56. Therefore, ALJ Aranda proceeded to step four. Id. at 58.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work." Phillips, 357 F.3d at 1238. As to the first prong, ALJ Aranda determined that Claimant had the RFC:

> to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except never climb ladders, ropes or scaffolds; frequently climb ramps and stairs; frequently kneel, crouch or crawl; never work at unprotected heights; must avoid concentrated exposure to extreme heat, extreme cold, humidity, vibrations, hazards, fumes, odors, dusts, gases or poor ventilation; and must avoid even moderate exposure to hazards. Claimant can understand and remember simple instructions; perform simple routine and repetitive tasks; make simple work-related decisions; and adequately adapt to simple changes in the work place. He is able to interact frequently with supervisors and coworkers, and occasionally with the general public.

TR. 58. Based on Claimant's RFC, ALJ Aranda moved to prong two of step four and concluded that Claimant was not able to perform any past relevant work. Id. at 63. ALJ Aranda then proceeded to the fifth and final step. Id. at 64.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC. Phillips, 357 F.3d at

1239-40.  ALJ Aranda determined that, given Claimant's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy which Claimant could perform.  TR. 64.  Therefore, ALJ Aranda concluded that Claimant was not under a disability, as defined in the Social Security Act, from April 18, 2016, the alleged onset date, through the date of the Unfavorable Decision.  Id. at 65.

<u>**DISCUSSION**</u>

Because some of Claimant's arguments are intertwined, the undersigned reorganizes them as follows:

    A.  New evidence submitted to the Appeals Council was not properly considered despite contradicting ALJ Aranda's decision (Claimant's Argument II);

    B.  ALJ Aranda failed to properly assess the evidentiary weight given to Dr. Poitier and Dr. Weinstein (Claimant's Arguments III & V);

    C.  ALJ Aranda failed to give proper consideration to the lay testimony of Ms. Mallard (Claimant's Argument IV);

    D.  ALJ Aranda posed an incomplete and erroneous hypothetical question to VE Lessne (Claimant's Argument VI);

    E.  Contrary to SSR 16-3P, ALJ Aranda improperly suggested a lack of treatment disqualifies Claimant from disability (Claimant's Argument VII);

    F.  ALJ Aranda's RFC assessment is not supported by substantial evidence or by either a treating or examining medical source (Claimant's Argument VIII);

    G.  ALJ Aranda improperly assessed Claimant's GAF scores (Claimant's Argument I); and

    H.  ALJ Aranda failed to properly consider medication side effects as required by SSR 96-7p and SSR 96-8p (Claimant's Argument IX).

The undersigned finds no merit in any of these contentions.

**A.  Whether new evidence submitted to the Appeals Council was properly considered**

Claimant argues that the Appeals Council committed an error that compels remand when

it concluded that the outcome of this case would not have been changed by new evidence, which consisted of: Dr. Ray's consultation report; Dr. Salado's orthopedic evaluation; the updated monthly treatment notes from New Horizons; and the updated psychiatric evaluation and functional assessment by Dr. Poitier and ARNP Andino.  See Claimant's Motion for Summary Judgment [D.E. 20 at 11].  Specifically, the Appeals Council found that the new evidence did "not show a reasonable probability that it would change the outcome of the decision." TR. 2.

With few exceptions, a claimant may present new evidence at each stage of the administrative review process.  See 20 C.F.R. § 416.1400(b).  "The [Appeals Council] must consider new, material, and chronologically relevant evidence and must then review the case if the ALJ's decision is contrary to the weight of the evidence currently of record."  Levie v. Comm'r of Soc. Sec., 514 F. App'x 829, 832 (11th Cir. 2013) (citing 20 C.F.R. §§ 404.970(b), 416.1470(b)).  "Whether evidence is 'new, material, and chronologically relevant' is a question of law subject to de novo review."  Clough v. Comm'r of Soc. Sec., 636 F. App'x 496, 2016 WL 66843, at *1 (11th Cir. Jan. 6, 2016).  "When a claimant properly presents new evidence to the [Appeals Council] and it denies review, [courts] essentially consider the claimant's evidence anew to determine whether 'that new evidence renders the denial of benefits erroneous.'"  Levie, 514 F. App'x at 832 (quoting Ingram v. Comm'r of Soc. Sec., 496 F.3d 1253, 1262 (11th Cir. 2007)).  Evidence is new if it is non-cumulative to the evidence submitted to the ALJ.  Hyde v. Bowen, 823 F.2d 456, 459 (11th Cir. 1987).  Evidence is chronologically relevant if it "relates to the period on or before the date of the [ALJ] hearing decision."  See 20 C.F.R. § 416.1470(b).  Evidence is material if "there is a reasonable possibility that the new evidence would change the administrative result."  Hyde, 823 F.2d at 460.

As an initial matter, Dr. Ray's report, Dr. Salado's report, the New Horizons records,

and Dr. Poitier and ARNP Andino's evaluation and assessment were new because they included evidence that was not submitted to ALJ Aranda. Hyde, 823 F.2d at 459.

Regarding chronological relevance, the New Horizons records from February 21, 2018, March 23, 2018, and April 20, 2018 post-date the January 30, 2018 Unfavorable Decision; and Dr. Poitier and ARNP Andino's evaluation and assessment were dated February 28, 2018, approximately one month after the Unfavorable Decision. Therefore, these records may not be considered chronologically relevant. See 20 C.F.R. 416.1470(b). However, Dr. Salado's report, Dr. Ray's report and the New Horizons records dated pre-January 30, 2018 would be chronologically relevant as they were produced on or before the date of ALJ Aranda's Unfavorable Decision. TR. 72-73, 82-86, 94-96.

The undersigned next considers whether each of the new and chronologically relevant items of evidence was material. With regard to Dr. Salado's report, Claimant argues that Dr. Salado established that Claimant "will experience periodic pain exacerbations intense enough to warrant medical intervention, thus interfering with his ability to sustain work." See Claimant's Reply [D.E. 23 at 5]. However, Dr. Salado opined that Claimant should not lift over 20 pounds or engage in activities or occupations that require repetitive movements of the spine, such as pushing, pulling, lifting or hauling; or participate in high impact activities. Id. at 85-86. Thus, Dr. Salado provided limitations that do not preclude the performance of light work as determined by ALJ Aranda. With regard to Dr. Ray's report, nothing in the report indicates an opinion as to Claimant's ability to work beyond his opinion that Claimant had an 8% partial permanent impairment, and there is nothing to show that Dr. Ray's report is contrary to the evidence of record. TR. 73. With regard to the New Horizons records dated October 23, 2017, December 26, 2017, and January 23, 2018, Claimant argues that these records show Claimant's continuing

symptoms, including depressed mood, labile affect, and auditory hallucinations. <u>See</u> Claimant's

Motion for Summary Judgment [D.E. 20 at 11]. However, these records are not inconsistent

with or remarkably different from the New Horizons records dated December 6, 2016 through

July 17, 2017 that documented these same symptoms and were considered by ALJ Aranda.

Therefore, the undersigned finds that the Appeals Council was correct in concluding that each

new and chronologically relevant item of evidence provided by Claimant was not material since

there was not "a reasonable possibility that the new evidence would change the administrative

result" of the case. <u>See</u> <u>Hyde</u>, 823 F.2d at 460.

In light of the foregoing, Dr. Salado's report, Dr. Ray's report, the New Horizons records,

and Dr. Poitier and ARNP Andino's evaluation and assessment do not render ALJ's Aranda's

decision "contrary to the weight of the evidence currently of record;" hence, remand is not

warranted on these grounds. <u>Levie</u>, 514 F. App'x at 832; <u>Ingram</u>, 496 F.3d at 1262.

## B. Whether ALJ Aranda properly weighed the opinions of Dr. Poitier and Dr. Weinstein

"Medical opinions are statements from physicians and psychologists or other acceptable

medical sources that reflect judgments about the nature and severity of the claimant's

impairment(s), including the claimant's symptoms, diagnosis and prognosis, what the claimant

can still do despite impairment(s), and the claimant's physical or mental restrictions." <u>Winschel</u>

<u>v. Comm'r of Soc. Sec.</u>, 631 F.3d 1176, 1178-79 (11th Cir. 2011) (quoting 20 C.F.R. §§

404.1527(a)(2), 416.927(a)(2)). An ALJ is "required to state with particularity the weight [given

to] the different medical opinions and the reasons therefor." <u>Sharfarz v. Bowen</u>, 825 F.2d 278,

279 (11th Cir. 1987). "In the absence of such a statement, it is impossible for a reviewing court

to determine whether the ultimate decision on the merits of the claim is rational and supported by

substantial evidence." <u>Winschel</u>, 631 F.3d at 1179 (quoting <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981)).

"The opinion of a treating physician . . . must be given substantial or considerable weight unless 'good cause' is shown to the contrary." <u>Phillips</u>, 357 F.3d at 1240 (citation and quotation marks omitted).  The Eleventh Circuit has held that "good cause" exists where the: (1) treating physician's opinion was "not bolstered by the evidence;" (2) "evidence supported a contrary finding;" or (3) the treating physician's opinion was "conclusory or inconsistent with their own medical records." <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).  "When the ALJ has articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error." <u>Weekley v. Comm'r of Soc. Sec.</u>, 486 F. App'x 806, 808 (11th Cir. 2012) (citing <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1212 (11th Cir. 2005)).

Where an ALJ fails to state "with at least some measure of clarity the grounds for his decision," then a court "will decline to affirm simply because some rationale might have supported the ALJ's conclusion." <u>Id.</u> (quoting <u>Owens v. Heckler</u>, 748 F.2d 1511, 1516 (11th Cir. 1984)).  "In such a situation, to say that the ALJ's decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Id.</u> (citing <u>Cowart</u>, 662 F.2d at 735).  The Eleventh Circuit has held that the failure to state the weight given to an examining physician is harmless error where the physician's opinions are consistent with the RFC. <u>See</u>, <u>e.g.</u>, <u>Colon v. Colvin</u>, No. 15-14547, 2016 WL 4727993, at *2 (11th Cir. Sept. 12, 2016); <u>Sarria v. Comm'r of Soc. Sec.</u>, 579 F. App'x 722, 724 (11th Cir. 2014); <u>Shaw v. Astrue</u>, 392 F. App'x 684, 687 n.1 (11th Cir. 2010); <u>Wright v. Barnhart</u>, 153 F. App'x 678, 684 (11th Cir. 2005) ("Although the

ALJ did not explicitly state what weight he afforded the opinions of [four doctors], none of their opinions directly contradicted the ALJ's findings, and, therefore, any error regarding their opinions is harmless.").

### a. Dr. Poitier

ALJ Aranda assigned "little weight," or "partial weight," to Dr. Poitier's opinions.  TR. 62.  Claimant argues that ALJ Aranda erred because she did not properly state with specificity and clarity the weight accorded to the opinion of Dr. Poitier; and that her statements regarding Dr. Poitier are contradictory and irreconcilable.  See Claimant's Motion for Summary Judgment [D.E. 20 at 13-14].  However, ALJ Aranda explained:

> The undersigned gives little weight to treating psychiatrist Dr. Joseph W. Poitier, MD who, on July 25, 2017, opined the claimant's mental illness was permanent, and he was too mentally unstable for work.  Additionally, he opined the claimant's condition and circumstances were progressively poor, resulting in interruptions to daily copy [sic] mechanisms.  The opinion is considered because of Dr. Poitier's specialty.  However, it is too extreme and contradicted by overwhelming evidence to the contrary, including NP Andino's notes documenting improvement.  In addition, the record indicates that the claimant was primarily treated by NP Nelson Andino, ARNP, and Dr. Poitier only saw him on 4-5 occasions.  As such, he did not rely on a longitudinal picture for his opinion.  Moreover, Dr. Poitier failed to provide supporting clinical notes.  Therefore, the undersigned finds that this opinion merits only partial weight.

TR. 62. (citations omitted).  Thus, ALJ Aranda stated with particularity the weight given to the opinion of Dr. Poitier and explained the reasons for assigning said weight.  Further, given that ALJ Aranda concluded that Dr. Poitier's opinion was contradicted by ARNP Andino's treatment notes, Dr. Poitier treated Claimant infrequently, and Dr. Poitier did not provide supporting documentation for his opinions, ALJ Aranda articulated "good cause" for assigning Dr. Poitier's opinions "little weight" or "partial weight;" and she supported her decision with "such relevant evidence as a reasonable person would accept as adequate to support the conclusion from the record." Kieser, 222 F. Supp. 2d at 1305.  Therefore, there is no basis to assign error.  Weekley,

486 F. App'x at 808; <u>Lewis</u>, 125 F.3d at 1440; <u>Phillips</u>, 357 F.3d at 1240; <u>Sharfarz</u>, 825 F.2d at 279.

### b. Dr. Weinstein

In his evaluation, Dr. Weinstein noted that Claimant was cooperative with good eye contact, had acceptable grooming and personal hygiene, and had clear and organized but limited speech. TR. 1902. He opined that Claimant: was a functional communicator, had logical and congruent responses, had a blunted affect with a depressed mood, had poor judgment and limited insight into the nature of his problems, and tolerated testing well. <u>Id.</u> He noted that Claimant completed all tasks presented to him. <u>Id.</u> Dr. Weinstein opined that there was no evidence of an aphasia, agnosia, apraxia, alexia or agraphia; and that there was no overt evidence of a psychosis, but a thought disorder might be present. <u>Id.</u> On mental status examination, Dr. Weinstein observed that Claimant had a full sensorium, poor attention and concentration, poor short-term memory, poor fund of information, poor calculation skills and poor reasoning. <u>Id.</u> Dr. Weinstein further observed that Claimant was unable to manage his finances; was able to dress, bathe and feed himself; and was able to stay on task without difficulty. <u>Id.</u> at 1902-03. He noted that Claimant stopped working due to his paranoia. <u>Id.</u> at 1903. Dr. Weinstein's diagnostic impressions included schizoaffective disorder by history, hypertension, seizures, asthma, sleep apnea, occupational problems, problems with the social environment, and access to adequate housing. <u>Id.</u>

ALJ Aranda summarized Dr. Weinstein's findings, but did not explicitly indicate what weight, if any, she gave to Dr. Weinstein's opinions. <u>Id.</u> at 60-61. However, she did explain that she placed significance on the absence of "a valid assessment" and lack of records:

> Significantly, [Dr. Weinstein] documented that the claimant did not put forth
> sufficient effort to allow for a valid assessment of his current functioning. There

were also no records available to substantiate the claimant's complaint of emotional problems.

Id. at 61.   Further, Dr. Weinstein's opinions, including that Claimant was a functional communicator and able to stay on task without difficulty, are consistent with ALJ Aranda's RFC determination that Claimant could perform light work with certain limitations.   Thus, ALJ Aranda's failure to state the weight given to Dr. Weinstein is, at most, harmless.   Cf. Colon, 2016 WL 4727993, at *2; Sarria, 579 F. App'x at 724; Shaw, 392 F. App'x at 687 n.1; Wright, 153 F. App'x at 684.

**C.   Whether ALJ Aranda properly considered the lay testimony of Ms. Mallard**

"There is no requirement in the Social Security regulations or rulings that the ALJ assign any weight to non-medical sources, only that the evidence be considered."   Reed v. Astrue, Case No. 09–0149–KD–N, 2009 WL 3571699, at *3 (S.D. Ala. Oct. 26, 2009) (citing 20 C.F.R. § 416.913(d); SSR 06–03p).   "The testimony of family members is evidence of a claimant's subjective feelings of pain.   See Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). Even if the ALJ fails to make an explicit credibility determination as to a family member's testimony or statements, however, we will not find error if the credibility determination was implicit in the rejection of the claimant's testimony.   Id. at 1254–55."   Osborn v. Barnhart, 194 F. App'x. 654, 666 (11th Cir. 2006).   Likewise, "an ALJ may 'disregard lay witness testimony [if] he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.'"   Cole v. Comm'r of Soc. Sec., Case No. 6:11-cv-1187-Orl-TEM, 2012 WL 4077233, at *4 (M.D. Fla. Sept. 17, 2012) (citations omitted).

Claimant argues that ALJ Aranda erred by rejecting the testimony of Ms. Mallard "without a sufficiently reasonable basis."   See Claimant's Motion for Summary Judgment [D.E. 20 at 15-16].   ALJ Aranda discussed Ms. Mallard's statement as follows:

The claimant's ex-fiancée and mother of his three children, Jessica Mallard, reported in a July 26, 2017 affidavit that the claimant started having mental problems in 2008 or 2009. She stated he had hallucinations and suicidal/homicidal ideation, was violent, and had caused chaos in their home. However, she also stated she had moved out and did not know how he got to the Miami Rescue Mission. Ms. Mallard reported the claimant had been Baker Acted a few times and given psychotropic medication; and, opined he would get worse without psychiatric help. However, she is not a doctor, was vague about dates, and may have been opining about incidents that occurred several years ago. Although the undersigned has taken her statements into consideration, the lack of specificity and likelihood that they relate to remote events, do not permit an assignment of great weight. In addition, like the claimant's, Ms. Mallard's statements are inconsistent with the preponderance of observations by medical doctors; and, do not establish that he is disabled.

TR. 63. ALJ Aranda took into consideration Ms. Millard's lay testimony and adequately explained her reasons for not assigning it great weight. Further, ALJ Aranda noted that Ms. Millard "is not a doctor" and is thus not the source of a proper medical opinion. Therefore, there is no error in ALJ Aranda's treatment of Ms. Millard's opinion. See Reed, 2009 WL 3571699, at *3; Cole, 2012 WL 4077233, at *4.

### D. Whether ALJ Aranda's hypothetical question to VE Lessne was proper

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002). The ALJ's hypothetical "need only include the claimant's impairments," and not "each and every symptom" allegedly suffered by the claimant but either not supported by medical records or alleviated by medication. Ingram v. Comm'r of Soc. Sec., 496 F.3d 1253, 1270 (11th Cir. 2007). Also, "the ALJ [i]s not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004).

Claimant argues that ALJ Aranda failed to pose a hypothetical question to VE Lessne that properly accounted for Claimant's moderate limitations in concentration, persistence or pace,

adapting and managing himself, and interacting with others as required under Winschel.  See
Claimant's Motion for Summary Judgment [D.E. 20 at 19].  Winschel held that, for a vocational
expert's testimony to constitute substantial evidence, the ALJ must implicitly or explicitly
account for a claimant's limitations in concentration, persistence, and pace.  631 F.3d at 1181.
Here, ALJ Aranda found that Claimant had moderate deficits: in interacting with others; in his
ability to maintain concentration, persistence and pace; and in his ability to adapt and manage
himself.  TR. 57.  In her hypothetical to VE Lessne, ALJ Aranda included the following
limitations:

> The individual can never climb ladders, ropes or scaffolds.  The individual can
> frequently climb ramps and stairs.  The individual can frequently kneel, crouch
> and crawl.  The individual can never work at unprotected heights.  The individual
> must avoid concentrated exposure to extreme heat and extreme cold, humidity,
> vibrations, hazards, fumes, odors, dust, gases and poor ventilation.  The individual
> must avoid even moderate exposure to hazards, can understand and remember
> simple instructions, can perform simple routine and repetitive tasks, can make
> simple work-related decisions, can adequately adapt to simple changes in the
> work place and the individual is able to interact frequently with supervisors and
> co-workers, and occasionally with the general public.

Id. at 154-55.  These limitations properly reflect Claimant's limitations in social functioning and
concentration, persistence, and pace.  Washington v. Soc. Sec. Admin., Comm'r, 503 F. App'x
881, 883 (11th Cir. 2013) (finding that "asking the VE a hypothetical question that included the
restriction that Washington was limited to jobs that involved only occasional interaction with the
general public and coworkers," and "limited to performing only simple, routine repetitive tasks
with up to three-step demands, and only occasional changes in the work setting, judgment, or
decision making" properly accounted for the claimant's social functioning, concentration,
persistence, and pace limitations).  The hypothetical also considered Claimant's impairments that
relate to his ability to adapt and manage himself, including ability to adapt to simple changes and
interactions with others.  Claimant further argues that ALJ Aranda failed to include limitations

found by Dr. Weinstein.   See Claimant's Motion for Summary Judgment [D.E. 20 at 19-20].

However, as explained above, ALJ Aranda did not place any weight on Dr. Weinstein's opinion,

and she was not required to include findings in her hypothetical that she had rejected.   Crawford,

363 F.3d at 1161.   Hence, there is no error in ALJ Aranda's hypothetical question to VE Lessne.

See Winschel 631 F.3d at 1181.

### E.   Whether ALJ Aranda properly considered Claimant's symptoms as required by SSR 16-3p

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step

one is to determine whether the individual has a medically determinable impairment that could

reasonably be expected to produce the alleged symptoms."   Contreras-Zambrano v. Comm'r of

Soc. Sec., No. 17-12447, 2018 WL 618420, at *3 (11th Cir. Jan. 30, 2018) (citing SSR 16-3p, 82

Fed. Reg. 49,462, 49,463-64 (Oct. 25, 2017)).   "Step two is to evaluate the intensity and

persistence of an individual's symptoms, such as pain, and determine the extent to which an

individual's symptoms limit [his] ability to perform work-related activities."   Id. (citing SSR 16-

3p, 82 Fed. Reg. at 49,464-66).   An ALJ considers "whether there are any inconsistencies in the

evidence and the extent to which there are any conflicts between [the individual's] statements

and the rest of the evidence, including [his] history, the signs and laboratory findings, and

statements by [his] medical sources or other persons about how [his] symptoms affect [him]."   20

C.F.R. § 404.1529(c)(4).   SSR 16-3p, effective March 28, 2016, clarified that "subjective

symptom evaluation is not an examination of an individual's character."   82 Fed. Reg. at 49,463.

Here, ALJ Aranda stated that "[a]fter careful consideration of the evidence, the

undersigned finds that the claimant's medically determinable impairments could reasonably be

expected to cause the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not entirely consistent with the

medical evidence and other evidence in the record." TR. 59. ALJ Aranda explained that ARNP Andino's treatment notes indicated moderate limitations that were improving over time, with decreased symptoms of hallucinations and delusions; and included regular observations that Claimant was generally doing well, was alert and oriented x3, and had no suicidal or homicidal ideations. Id. ALJ Aranda further noted that, although Claimant expressed concerns with medication treatment, he admitted that he felt better when his dosage was increased. Id. at 59-60. ALJ Aranda next discussed Claimant's hospitalizations at Jackson, noting that Claimant reported improvement and presented well at discharge in April 2016 and May 2016. Id. at 60. She noted that Claimant sought a medication refill in October 2016 and that the "treating physician documented the claimant's report that he was compliant with his September discharge regimen, and happy it was successfully controlling his hallucinations;" and that, thereafter, he began treatment at New Horizons. Id. ALJ Aranda further explained:

> The claimant alleged he stopped working on March 1, 2016 because of his mental impairments. However, the record shows he waited 8 months before seeking regular psychiatric outpatient treatment. It also shows that he has had a few psychiatric hospitalizations; however, all occurred between April and September 2016, which was before he started regular psychiatric care at New Horizons. The claimant's improvement while hospitalized, benign mental status examinations at discharge, and cessation of psychotic episodes after he started regular care, demonstrate that his symptoms are controlled with medication and treatment. The claimant admitted as much when he testified he had used illegal drugs when he could not afford medication, and treatment had removed his urge to use them. Additionally noteworthy are treating NP Andino's generally benign findings; assignment of a moderate GAF rating of 54 that he increased to 60 after only 7 months; and, his most recent clinical notes documenting that the claimant no longer suffers from hallucinations. His notes also indicate, and the claimant confirmed at the hearing, that he has refused to take stronger medication that would increase his improvement.
>
> Additionally, it appears that the claimant's complaints of limitations caused by his physical impairments are secondary to his mental concerns. He did not mention any physical impairments in his May 2016 Disability Report. Moreover, the record demonstrates he only has mild cervical issues, and has not sought treatment for his hernia since March 2017.

***

> The claimant's allegations, which are unsupported and contradicted by findings in the treatment notes, simply do not evidence disabling symptoms and limitations.

Id. at 61-63 (citations omitted).

Claimant argues that ALJ Aranda improperly suggested that Claimant's impairments were not severe due to his failure to seek treatment and that ALJ Aranda failed to examine the reasons for the lack of treatment. See Claimant's Motion for Summary Judgment [D.E. 20 at 20-22]. However, while ALJ Aranda noted Claimant's delay in obtaining treatment and objections to increased dosages of medication, she specifically stated that "his symptoms [were] controlled with medication and treatment" and documented his continued compliance and effort to seek medication refills and psychotherapy treatment. TR. 61. ALJ Aranda explained her assessment of Claimant's allegations, based on the medical evidence of record and not solely on Claimant's compliance or noncompliance with treatment. See Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (where "the ALJ's determination that [the claimant] was not disabled was not significantly based on a finding of noncompliance," there was no error in the "ALJ's finding that [the claimant's] seizures resulted from noncompliance with medical treatment.") Because ALJ Aranda supported her findings regarding Claimant's allegations of the intensity, persistence, and limiting effects of his symptoms with substantial evidence, there is no error. See Kieser, 222 F. Supp. 2d at 1305.

### F. Whether ALJ Aranda's RFC determination is supported by substantial evidence or by either a treating or examining medical source

"The determination of residual functional capacity is within the authority of the ALJ and the assessment should be based upon all of the relevant evidence of a claimant's remaining ability to do work despite her impairments." Beech v. Apfel, 100 F. Supp. 2d 1323, 1331 (S.D.

Ala. 2000). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p. Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id. "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is not enough to enable [the Court] to conclude that the ALJ considered [Claimant's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). The ALJ's "opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard." Turner ex rel. Turner v. Barnhart, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005).

When substantial evidence supports the ALJ's decision, it must be affirmed. See Crawford, 363 F.3d at 1158-59. "Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Kieser, 222 F. Supp. 2d at 1305. "[I]n determining whether the Commissioner's decision is supported by substantial evidence, the court is not to re-weigh the evidence, but is limited to determining whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled." Cooley v. Astrue, No. 8:08-cv-553-T-TBM, 2009 WL 799444, at *3 (M.D. Fla. Mar. 24, 2009) (citing Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996)).

Claimant argues that ALJ Aranda's RFC assessment is not supported by substantial evidence because it is not supported by a treating or examining medical source. See Claimant's

Motion for Summary Judgment [D.E. 20 at 22-24]. He further argues that ALJ Aranda minimized Claimant's mental status findings and the significance of Claimant's crisis hospitalizations at Jackson; and was incorrect in her conclusion that Claimant improved through treatment to the point he was no longer significantly impaired. Id. at 7-9.

In her discussion of Claimant's RFC, ALJ Aranda explained that, in making the RFC determination, she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id. As to the medical evidence of record, ALJ Aranda discussed ARNP Andino's treatment notes from New Horizons, which generally indicated that Claimant improved over time; and ARNP Andino's observation that Claimant appeared unremarkable, with a "completely benign" mental status examination by July 2017. Id. at 59-60. ALJ Aranda also discussed Claimant's records from Jackson. Regarding Claimant's April 2016 admission, she noted:

> During treatment, he reported improvement and a readiness to start the next chapter of his life. By the date of discharge, the claimant was found to be pleasant, calm and cooperative, with alert sensorium; orientation x3; fair grooming; clear and coherent speech; an organized and goal-oriented thought process; fair insight and judgments; fair attention and concentration; no abnormal movements; and no delusions, suicidal/homicidal ideation or hallucinations.

Id. at 60. ALJ Aranda also noted that Claimant had a completely benign mental status examination upon discharge after a one-week admission in May 2016. Id. She discussed his subsequent admissions, noting that his hallucinations were under control. Id. As to Dr. Weinstein's consultative examination, ALJ Aranda noted that Dr. Weinstein was unable to make a valid assessment of Claimant's current functioning and there were no records to substantiate Claimant's complaint of emotional problems. Id. at 60-61.

As to the opinion evidence, ALJ Aranda gave partial weight to the opinions of Dr. Conger and Dr. Cornier that Claimant was capable of performing routine tasks on a sustained

and independent basis and in a socially appropriate manner, and that his prognosis was improved with substance-abstinence and treatment compliance; and that Claimant was capable of: understanding/recalling and performing tasks on a reasonably sustained basis; appropriately interacting with co-workers; adapting to changes in routine; and making plans independently. Id. at 62.  ALJ Aranda explained:

> The opinions are consistent with the evidence, including the claimant's testimony and medical evidence indicating he did not start formal psychiatric care until 8 months after the alleged onset date; generally benign mental status examination findings in psychiatric notes and hospital records; a GAF assignment of 54 that was increased to 60 in 7 months, indicating symptoms of moderate severity and improvement with time; the claimant's testimony that treatment has helped with his substance abuse; and a recent cessation of his primary symptom of hallucinations, demonstrating a good response to treatment and improvement. However, the psychologists did not have the benefit of the evidence at the hearing level.

Id.

Claimant further argues that ALJ Aranda minimized Claimant's spine impairments and failed to consider Claimant's physical knee, elbow and heart impairments.  See Claimant's Motion for Summary Judgment [D.E. 20 at 10].  However, ALJ Aranda considered the Jackson records related to Claimant's physical impairments, noting that, "upon examination, the hernia was deemed to be causing only mild pain;" that there was no evidence of an acute fracture of traumatic spondylolisthesis or of acute fracture or mal-alignment in the cervical spine; and that, although Claimant was diagnosed with acute neck pain, he was discharged the same day in "improved, stable and ambulating" condition.  Id. at 61.  ALJ Aranda also assigned "great weight" to Dr. Krishnamurthy's opinions as to Claimant's physical impairments and limitations, and his opinion that Claimant could perform work at the light exertional level with some limitations, finding that:

> The opinion is consistent with the totality of the evidence, including the claimant's failure to include them in his initial disability report; diagnostic findings that his cervical issues are of mild severity; and the record indicating only a single complaint of pain related to his hernia.

Id. at 63.  Further, the record demonstrates that ALJ Aranda considered the medical record as a whole, and the ALJ is not required to "refer to every piece of evidence in his decision."  See Dyer, 395 F.3d at 1211.

Finally, as discussed above, ALJ Aranda had good cause for assigning "little weight" to the opinion of Dr. Poitier.

Given that ALJ Aranda's RFC determination was supported by evidence from Jackson medical records, ARNP Andino's New Horizons treatment records, and the opinions of the state agency consultants, ALJ Aranda's RFC assessment that Claimant was able to perform light work with certain limitations was supported by "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."  Kieser, 222 F. Supp. 2d at 1305.  Therefore, ALJ Aranda's RFC assessment was supported by the evidentiary record.

### G. Whether ALJ Aranda properly assessed Claimant's GAF scores

"The Commissioner has declined to endorse the GAF scale 'for use in the Social Security and SSI disability programs,' and has indicated that GAF scores have 'no direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005).  "GAF scores may be helpful in formulating a claimant's RFC, but are not essential to the RFC's accuracy, and an ALJ's failure to describe GAF scores does not render the ALJ's RFC assessment inaccurate."  Thornton v. Comm'r of Soc. Sec., 597 F.App'x. 604, 613 (11th Cir. 2015) (citing Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002)).

Claimant argues that ALJ Aranda erred in assigning "some weight" to Claimant's GAF scores and using them as evidence of a lack of severity of impairment.  See Claimant's Motion

for Summary Judgment [D.E. 20 at 7]. While considering ARNP Andino's records, ALJ Aranda

noted that ARNP Andino initially assigned Claimant a GAF rating of 54, and later increased the

rating to 60; and remarked that this "indicat[ed] symptoms of moderate severity and

improvement with time." TR. 59, 61-62. Regarding the GAF scores, ALJ Aranda stated:

> The undersigned notes that the record contains GAF scores. The Commissioner
> has declined to endorse the GAF scale for 'use in Social Security and SSI
> disability programs,' and has indicated GAF scores have no 'direct correlation to
> the severity requirements [of the] mental disorders listings.' Further, GAF scores
> are a snapshot of what the claimant's level of functioning is at that particular time,
> and is not an indication of overall functioning. While some weight was given to
> these scores, the undersigned must rely on evidence that demonstrates the
> claimant's overall ability to function.

Id. at 63.

ALJ Aranda explained that she relied on other evidence of record, and not on the GAF

scores, in making her decision. Further, as described above, substantial evidence supported ALJ

Aranda's RFC determination. Therefore, there was no error in ALJ Aranda's assignment of

"some weight" to the GAF scores. Thornton, 597 F.App'x. at 613 (finding no error where the

ALJ considered some, but not all, of a claimant's GAF scores and substantial evidence otherwise

supported the ALJ's decision).

**H. Whether ALJ Aranda properly considered medication side effects**

Claimant argues that ALJ Aranda failed to consider the side effects of his medications as

required by SSR 96-7p and SSR 96-8p. See Claimant's Motion for Summary Judgment [D.E. 20

at 24-25].[19] Specifically, Claimant pointed to his hearing testimony that his medications caused

---

[19] SSR 96-7p was superseded by SSR 16-3p as of March 16, 2016. See
https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di-01.html. SSR 16-3p provides that when
evaluating the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ will
consider factors in addition to the objective medical evidence, including "[t]he type, dosage,
effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain to other
symptoms." SSR 16-3p.

him problems with concentration, prompted suicidal ideations, and made him weak and prone to falls. Id. at 24-25. Claimant also points to his own subjective reports of side effects in his application, including: anxiety, dizziness, blurred vision, insomnia, sleepiness, stomach pain, lack of focus, and fatigue. Id. at 24-25.

In determining whether a claimant's impairments limit his or her ability to work, the ALJ takes into account the claimant's subjective symptoms, which include the effectiveness and side effects of any medications taken for those symptoms. 20 C.F.R. § 416.929(c)(3)(iv); Colon ex rel. Colon v. Comm'r of Soc. Sec., 411 F.App'x 236, 238 (11th Cir. 2011). However, "[w]here a represented claimant raises a question as to the side effects of medications, but does not otherwise allege the side effects contribute to the alleged disability, [the Eleventh Circuit has] determined the ALJ does not err in failing to inquire further into possible side effects." Burgin v. Comm'r of Soc. Sec., 420 F.App'x 901, 904 (11th Cir. 2011) (citing Cherry v. Heckler, 760 F.2d 1186, 1191 n.7 (11th Cir. 1985)).

As previously discussed, ALJ Aranda found that "the objective medical evidence record [did] not indicate that the claimant's impairment [was] as severe as alleged or that he [was] unable to do any work." TR. 61. ALJ Aranda explained that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." Id. at 58. ALJ Aranda discussed Claimant's testimony that he did not want to take medication that would "completely eliminate his hallucinations" because it would "make him a zombie." Id. at 59. She further discussed ARNP Andino's treatment notation that

---

SSR 96-8p provides that the "RFC assessment must be based on *all* of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8p.

Claimant did not want "a stronger dosage because he thought he would be unable to function," and she noted that, upon being given a stronger dosage thereafter, Claimant "subsequently stated he was feeling better." Id. at 60. Further, Jackson records repeatedly indicate that Claimant denied side effects from medications; with the exception of an October 28, 2016 treatment note, which documents that Claimant reported drowsiness, difficulty focusing and feeling "wired." Id. at 1361, 1708, 1715, 1929. The New Horizons treatment records also indicate that there were no signs of medication side effects between January 10, 2017 and July 17, 2017. Id. at 2171-77. Moreover, Claimant does not identify any medical evidence that indicates the side effects of his medications limit his ability to work. Thus, there is no basis to assign error. See Burgin, 420 F. App'x at 904; see also Gantea v. Comm'r of Soc. Sec., 380 F. App'x 950, 951 (11th Cir. 2010) ("[The ALJ] was entitled to discredit Gantea's complaints because neither of the physicians who prescribed Gantea's medications stated that side effects limited Gantea's ability to work.").

## RECOMMENDATION

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 20] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 21] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge. Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on

47

appeal the district court's order based on unobjected-to factual and legal conclusions." <u>See</u> 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 30th day of January, 2020.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc: United States District Judge Darrin P. Gayles
  Counsel of Record